# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date: May 11, 2017**

**NO. S-1-SC-36175**

**IN THE MATTER OF**
**D. CHIPMAN VENIE**

**An Attorney Disbarred from**
**the Practice of Law Before the Courts**
**of the State of New Mexico**

Jane Gagne
Albuquerque, NM

for Disciplinary Board


D. Chipman Venie
Albuquerque, NM

Respondent

**OPINION**

**CHÁVEZ, Justice.**

{1} Attorney D. Chipman Venie was permanently disbarred from the practice of law on January 18, 2017 for actions arising from his representation of three clients. *In re Venie*, No. S-1-SC-36175, amended order at 2 (N.M. Sup. Ct. Jan. 18, 2017) (non-precedential). Venie counseled the first client, L.A., to bribe witnesses and offered to deliver the bribery payment to the witnesses. Venie also unnecessarily revealed confidential communications from L.A. in a fee dispute case between them, and made material misrepresentations to tribunals and the Disciplinary Board. In representing the second client, R.C., Venie converted money for his own use that was provided to him by R.C.'s parents for the sole purpose of posting a bond for R.C. With respect to the third client, A.C., Venie filed a lien against the property of A.C.'s mother to secure a fee owed to him by A.C.

{2} The disciplinary charges against Venie were addressed in two consolidated cases. The first is Disciplinary Board Case No. 04-2015-720 (Case 720) involving L.A. The second is Disciplinary Board Case No. 01-2016-737 (Case 737) involving both R.C.'s and A.C.'s cases. Each Disciplinary Board hearing committee entered findings of fact and conclusions of law, and recommended that Venie be disbarred. The cases were consolidated, and the Disciplinary Board panel adopted each hearing

committee's findings of fact and concurred with their recommendation that Venie be disbarred.

{3} We review the factual findings for substantial evidence and the Disciplinary Board's legal conclusions and recommendations for discipline under a de novo standard of review. *See In re Bristol*, 2006-NMSC-041, ¶¶ 18, 26, 28, 140 N.M. 317, 142 P.3d 905 (per curiam). We hold that the findings of fact are supported by substantial evidence and that the recommendation of permanent disbarment is appropriate in this case. We have chosen to write an opinion in this case primarily to address Venie's defenses rather than to catalogue his myriad violations.

# I. DISCUSSION

## A. Case 720

{4} In Case 720, Venie raises two defenses that merit discussion. First, he asserts that the charge regarding counseling L.A. to bribe witnesses is barred by the four-year limitations period under Rule 17-303 NMRA (1994) because his alleged violations occurred on May 22, 2011 and the charges were not filed until September 9, 2015. Second, he contends that his disclosure of earlier confidential communications with L.A. in a fee dispute case was permissible to attack L.A.'s credibility and to illustrate the difficult issues he faced when representing him. We address these arguments in

turn.

{5}   The procedural history of Case 720 is relevant to our disposition of the limitations period issue. On April 20, 2015, the Disciplinary Board opened Case 720 and alleged that Venie had disclosed L.A.'s confidences in a public pleading filed in response to a lawsuit by L.A. L.A.'s lawsuit primarily related to a dispute about accounting of fees and property L.A. had provided as payment to Venie throughout Venie's representation of L.A. The original disciplinary complaint also alleged in the alternative that Venie had filed frivolous pleadings and made misrepresentations to both the district court and the Disciplinary Board.

{6}   On September 9, 2015, disciplinary counsel amended the complaint to include a count asserting that Venie had counseled L.A. to bribe witnesses. The new charges were based on a May 22, 2011 recording between Venie and L.A., which disciplinary counsel obtained from Venie during discovery.

{7}   Venie contends that the amended complaint is barred by the limitations period. Venie relies on the 1994 version of the limitations period under Rule 17-303, which stated:

>   Except in cases involving theft or misappropriation, conviction of a crime, or a knowing act of concealment, no complaint against a person subject to these rules shall be considered by the board unless a written complaint is filed with or initiated by chief disciplinary counsel in

3

accordance with these rules within four (4) years from the time the complainant knew or should have known the facts upon which the complaint is filed.

Venie argues that the limitations period ran on or about May 22, 2015, which was four years after May 22, 2011, when the conversation between him and L.A. occurred. Venie contends that the 2013 amendment to Rule 17-303, which eliminated the limitations period defense, does not apply retroactively to acts that occurred before the current rule's effective date of December 31, 2013.

{8} Contrary to Venie's assertions, none of the disciplinary charges against him are barred. Before the amendment, Rule 17-303 provided a limitations period, which is not strictly a statute of limitations, but even if we were to treat it as a rigid statute of limitations, the 2013 amendment to Rule 17-303 eliminating the limitations period nevertheless applies to Venie's conduct because Venie does not have a vested right in the application of the former limitations period. *See State v. Morales*, 2010-NMSC-026, ¶ 1, 148 N.M. 305, 236 P.3d 24 (noting that the abolishment or extension of a limitations period "cannot revive a previously time-barred prosecution," but "it can extend an unexpired limitation period because such extension does not impair vested rights acquired under prior law, require new obligations, impose new duties, or affix new disabilities to past transactions"). For

4

Venie to have a vested right in the 1994 limitations period, the facts giving rise to the disciplinary complaint would have had to occur at least four years before the 2013 amendment. *Grygorwicz v. Trujillo*, 2006-NMCA-089, ¶¶ 20-21,140 N.M. 129, 140 P.3d 550 (holding that an amendment providing an extension of the statute of limitations applied to conduct that occurred before the amendment was enacted because the cause of action was not time-barred by the preexisting law, and therefore the defendant had no vested right in a statute of limitations defense). Venie's conduct occurred on May 22, 2011, nineteen months before the effective date of the 2013 amendment to the limitations period. Accordingly, Venie had no vested right in a limitations period defense under the 1994 version of Rule 17-303, and therefore the amendment permissibly extended an unexpired limitation period. *Morales*, 2010-NMSC-026, ¶ 1; *Grygorwicz*, 2006-NMCA-089, ¶ 20. We conclude that the amendment abolishing the limitations period applies to Venie's conduct, and that the charges against Venie are not time-barred and can be properly reviewed by this Court. We now turn to the merits of Case 720.

**1.      Counseling his client to bribe witnesses**

{9}      Venie represented L.A. on felony charges which alleged that L.A. engaged in incest, criminal sexual contact, and criminal sexual penetration of his granddaughter

(Granddaughter). Venie recorded a conversation he had with L.A. on May 22, 2011 during which they discussed confrontations L.A. had with his son (Son), who is Granddaughter's father, and Granddaughter, despite a court order prohibiting L.A. from having contact with Granddaughter and Son.

{10} The following excerpts from the transcript of the recorded May 22, 2011 conversation (emphasis added) provide sufficient evidence to support the allegations that Venie counseled L.A. to bribe witnesses and offered to assist him with delivering the bribe.

> Venie: But [Son] and myself are bending over backwards to try and save you . . . .

Page 2, lines 21-22

> Venie: If you don't lay off [Son], you're going to end up in prison, dying there, okay, and you're going to end up probably getting raped to death in prison, all right?

Page 2, line 25 to page 3, line 3

> Venie: [Son], right now, is in Arizona or on his way to Arizona, and in his hand is paperwork that could get me disbarred, okay? And he could get in serious trouble, as well. And—and [another witness who had told the police L.A. was having a sexual relationship with Granddaughter] could get in serious trouble, as well. All three of us have decided to put our lives at risk to save you, okay?

Page 3, lines 6-10

6

Venie: If [Son] turns sideways on us, you're going to die in prison. If [Granddaughter] turns sideways on us, you're going to die in prison.

Page 3, lines 12-14

Venie: *Maybe you should think—maybe you should think about paying them* [Son and Granddaughter] *both off, okay? Now, even me suggesting* (inaudible) *gets me disbarred. But you see how far I'm willing to go—*

L.A.: I am paying them off.

Page 12, lines 2-6

Venie: *Do you see how far I'm willing to go to help you? I'm willing to put my own livelihood, everything you see around here, on the line to help you.*

Page 12, lines 8-10

Venie: [A]ll I know is if you don't kiss these people's ass and make them happy over the next year and a half or two while this case is pending, they're going to fucking fry you for it. Okay?

Page 15, lines 10-13

Venie: You know, all these people, every one of them could sink your ass, and you're still antagonizing them. Please, stop doing that.

Page 16, lines 7-9

Venie: *And what I'm—and what I'm telling you is—and I can't believe I'm saying this, but you might want to just pay* [Son and Granddaughter] *off, and that's it. I mean, you might want to start thinking about* (inaudible).

Page 39, lines 12-16

Venie: *And* (inaudible)—*and if it's something you want to do, I can make that happen for you and you would never have to give it directly to them. I would do it, and then that would be that.*

Page 39, lines 19-22

{11}     The above exchanges between Venie and L.A. support the conclusion that Venie violated Rule 16-102(D) NMRA, which states: "A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent or misleads the tribunal." Venie's advice to L.A. that he should consider paying off his accusers and the State's primary witnesses against L.A. unequivocally demonstrated Venie's intent to convince his client to bribe witnesses. Not only did Venie repeat his advice to L.A., he offered to help carry out the bribery. Venie presciently told L.A. that by simply counseling L.A. to bribe witnesses he could be disbarred. This conduct alone justifies disbarring Venie from the practice of law.

**2.     Making misrepresentations to a tribunal**

{12}     Venie made material misrepresentations to tribunals during his representation of L.A. and at his disciplinary proceedings. Prior to the May 22, 2011 conversation, Venie prepared affidavits for Granddaughter, Son, and another witness based on their statements to Venie, in which they all claimed that L.A. was innocent of the crimes for which he was charged. During their May 22, 2011 conversation, Venie repeatedly

8

acknowledged that L.A. had committed incest and L.A. confirmed his guilt.

{13} The following excerpts from Venie and L.A.'s May 22, 2011 conversation (emphasis added) provide insight into Venie's knowledge of L.A.'s crimes.

> Venie: *I know what you did, okay, and everybody knows what you did. And everybody's been acting like you didn't do it. And everyone's been lying and saying you didn't do it.*

Page 2, lines 14-17

> Venie: [Son]—this just kills me—[Son] can't even take his daughter to get counseling to try and deal with this because if that happens, that's going to hurt the legal case, all right? So [Son] is actually not giving [Granddaughter] the help she needs in order to help you, all right?

Page 3, lines 15-20

> Venie: *And, dude,* [Son]*'s lied,* [L.A.'s wife (Wife)] *lied,* [Granddaughter]*'s lied.* [Another witness]*'s getting a lie* [sic]. *Everyone's doing what you want them to do.*

Page 4, lines 12-14

> Venie: And I don't give a fuck how much money [Son] owes you, what he's done for you is priceless. Okay? *He got his own daughter to lie to cover up your crime. He's lying to cover up your crime.* He's in Arizona right now, fucking twisting [another witness]'s arm to cover up your crimes.

Page 5, lines 2-6

> Venie: If you—if it was my father, *I would not have done what* [Son] *had done. I would have probably shot your ass. Okay?*

9

Page 6, lines 12-14

Venie:  And [Son] has not only done that, he's really standing up for you.  Right now, as we sit here, he's on his way to Arizona—

L.A.:  I know.

Venie:  —to tie down the last part of the case.

Page 6, lines 16-21

L.A.:  And I'm taking the full brunt of it over the head.  *He tells me, "Well, you raped her."  Well, no, it's far from the truth.*

Page 7, line 24 to page 8, line 1

L.A.:  *She came to me naked.*

Page 8, line 3

Venie:  —you understand that's wrong, right?

L.A.:  *It's wrong.  I was—I fucked up big time.*

Venie:  So I don't care if she—that's not a defense.  All right?

Page 8, lines 6-11

Venie:  In fact, it's kind of disgusting to me.  All right?  So—but we're—that—that horse has already left the barn.  We're talking about what everyone's doing now.  *Okay?  You did what you did.  All right? I'm just trying to save you from dying in prison.  Okay?*

Page 8, lines 13-18

Venie:  I drafted up a statement for [other witness], and—in detail,

killing the shit out of that case—and said, "Two copies, take it to Arizona, signed, notarized, fingerprinted, bring it back." That's what [Son] did.

Page 9, lines 14-17

Venie: But he's told me he's going to call me today when it's all signed.

Page 10, lines 4-5

L.A.: See, I begged him to—

Page 10, line 7

L.A.: —get it done about a month ago

Page 10, lines 9-10

Venie: I mean, they're investigating you back 40 years. You know that?

Page 10, lines 15-16

L.A.: None of this shit has never [sic] come up before, never happened before. This deal was a fluke. I take 100 percent of the blame for it. I should have known better.

Page 11, lines 7-10

L.A.: I can't say nothing to her because I can't afford to make her mad. She's milking it to the hilt to get what she wants, and I know it. And that's fine, but I can't give myself no defense because if I say anything, I piss her off. I say anything, I piss him off.

Page 11, lines 17-22

Venie: *—his daughter got banged by his father—*

L.A.: *Yeah.*

Venie: —and he's still standing up for his father.

L.A.: Yeah.

Venie: So that's pretty unusual, to say the least. Okay?

L.A.: Yeah.

Page 29, line 19 to page 30, line 2

L.A.: I promise you, there won't be—me and him ain't gonna have another bump. It's like I told [Wife], I said—you know, he told [Wife], he says, well, *I forced her. I says, "That's a lie. She came to me naked." I fucked up. But I did not go to her. She came to me.* I can't say that. I can't tell [Wife] that—

Page 40, line 23 to page 41, line 3

L.A.: And it's like—and it's like I told [Wife], I said, "You know, I'm in a—I'm against a rock." And all I can say is, "*I'm sorry. I wish it hadn't have happened.* But what do you want me to do?"

Page 41, lines 9-12

{14}     After the May 22, 2011 conversation, Venie prepared another affidavit for Granddaughter on August 15, 2011, where she again claimed that she and L.A. had not had any sexual encounters. At L.A.'s criminal trial in October 2012, Granddaughter testified that L.A. had sexual contact with her, contrary to her affidavits. Venie then used the affidavits he had prepared for Granddaughter to

12

impeach her at trial.

{15} Criminal defense attorneys are permitted to put the State to its burden of proof and do not share in the State's duty to present the truth in a criminal proceeding. *United States v. Wade*, 388 U.S. 218, 256-58 (1967) (White, J., dissenting in part and concurring in part). Because a criminal defense attorney has a duty to represent his or her client whether or not the client is guilty, the attorney need not present any knowledge that he or she may have about the truth. *Id.* at 257. A defense attorney has the right to "cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying." *Id.* at 258. However, although attorneys should be encouraged to be zealous advocates, their duty to provide diligent representation to their clients "does not require the use of offensive tactics or preclude the treating of all persons involved in the legal process with courtesy and respect." Rule 16-103 NMRA, Comm. cmt. 1.

{16} What is particularly disconcerting is that Venie could have impeached Granddaughter with her initial statement to the police when she denied that she had ever had sexual relations with L.A. Instead, he sought to corroborate Granddaughter's initial statement to the police with an affidavit that Venie drafted for

her which he knew was perjured. Venie was permitted to hold the State to its burden of proving L.A.'s guilt beyond a reasonable doubt, but Venie's advocacy was flawed and "falls outside [the] protected behavior" of vigorously representing his client. *United States v. Thoreen*, 653 F.2d 1332, 1338-39 (9th Cir. 1981).

{17}     Venie's pattern of introducing false statements to tribunals continued when he represented L.A. during related civil litigation. On January 7, 2014, L.A. was acquitted of incest, criminal sexual contact, and criminal sexual penetration. On March 28, 2014, Venie sued Granddaughter, Son, two other named individuals, and Does 1-10 (unnamed detectives and/or other employees) of the Bernalillo County Sheriff's Department on L.A.'s behalf, alleging wrongful arrest and prosecution. L.A. was served with interrogatories from Bernalillo County in which he was asked to disclose any times he had been "accused of rape, sexual assault and/or battery or sexual misconduct of any kind during [his] lifetime." Venie counseled L.A. to dismiss the case because truthful responses to the discovery requests would be detrimental to the merits of the case. L.A. agreed to dismiss the county defendants but refused to dismiss the lawsuit against Granddaughter, Son, and one other defendant.

{18}     Venie's relationship with L.A. ultimately deteriorated. L.A. and Wife hired

14

another attorney to obtain an accounting of fees incurred and paid to Venie. L.A. and Wife also filed an application for a temporary restraining order and motion for preliminary injunction alleging that Venie was threatening them after the lawsuit was filed, and that Venie could potentially improperly dispose of funds and assets belonging to them. Venie failed to respond to the merits of the L.A. litigation, and instead focused on L.A.'s guilt, which Venie alleged he did not discover until after he had filed the civil lawsuit against L.A.'s accusers. Venie claimed that throughout his representation of L.A. in the criminal cases, L.A. had maintained his innocence.[1]

{19}     Because the May 22, 2011 recording undeniably demonstrates Venie's knowledge of L.A.'s guilt, we conclude there is substantial evidence proving that Venie introduced multiple misrepresentations to a tribunal, and therefore Venie violated Rules 16-303(A)(1), (A)(3), and 16-301 NMRA. During the May 22, 2011 conversation, Venie stated that he knew what L.A. did; L.A. also acknowledged Venie's statement, referring to Son, that "his daughter got banged by his father." Nevertheless, Venie knowingly filed a false affidavit denying any knowledge of L.A.'s guilt, stating under oath that "[t]hroughout the pendency of the criminal cases,

---

[1]Although Venie claims that throughout his representation of L.A. he only knew about L.A.'s guilt of incest and not of criminal sexual penetration, the hearing committee and the Disciplinary Board panel permissibly rejected Venie's assertion, particularly since none of the pleadings in the civil case made this distinction.

15

[L.A.] always told me he was innocent and that he did not [do] the things of which he was accused." Venie continued to deny knowledge of L.A.'s guilt during an underlying disciplinary proceeding, contrary to Rule 16-801(A) NMRA, which requires a lawyer in connection with a disciplinary matter to refrain from "knowingly mak[ing] a false statement of material fact."

{20}    Under Rule 16-303, lawyers are expected to exhibit candor toward tribunals. Subsection (A)(1) provides: "[a] lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." In the same vein, Subsection (A)(3) states that "[a] lawyer shall not knowingly . . . offer evidence that the lawyer knows to be false."

{21}    Despite knowing that L.A. had committed incest, Venie filed a frivolous lawsuit on L.A.'s behalf alleging that L.A. had been falsely accused and prosecuted. Rule 16-301 states: "[a] lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous . . . ." Venie did not have a good faith basis for bringing the lawsuit knowing that L.A. had admitted his incestuous conduct with Granddaughter.

{22}    Venie's conduct also violated Rule 16-804(C) and (D) NMRA, which define

16

professional misconduct, inter alia, as engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation" and "conduct that is prejudicial to the administration of justice." *See In re Neal*, 2003-NMSC-032, ¶¶ 7, 9, 134 N.M. 594, 81 P.3d 47 (per curiam) (finding a violation of Rule 16-804(C) and (D) for making false statements of material fact to a tribunal when a suspended lawyer misrepresented his ability to represent a client in court). Venie had a duty to refrain from introducing any misrepresentations to a tribunal. As an officer of the court, Venie was obligated to be truthful to courts of law. *In re Stein*, 2008-NMSC-013, ¶ 35, 143 N.M. 462, 177 P.3d 513 (per curiam). "Candor and honesty are a lawyer's stock and trade. Truth is not a matter of convenience." *Id.* (internal quotation marks and citations omitted). Here, Venie failed to follow one of the most basic ethical requirements imposed upon attorneys. *See Thoreen*, 653 F.2d at 1339 (noting that scrupulous candor and truthfulness in representations of any matter before a court is a basic ethical requirement for attorneys).

**3.     Revealing client confidences**

{23}     In his response to L.A. and Wife's petition for an accounting, application for a temporary restraining order, and motion for a preliminary injunction, Venie stated that L.A. "is a child molester and fraud [who] enjoyed having sex with under-aged

female relatives in his family (and other under-aged people), until he was finally caught and charged with multiple counts of incest." He also stated that L.A. "choked [Wife] and tried to kill a witness to cover up his multiple molestations, including one of the witnesses who directly saw him having sex with his granddaughter." Venie revealed that L.A. had told him he had engaged in "sexual intercourse with his grand-daughter, both by force and consensually." Venie also revealed that L.A. had told him "he had been having sex with multiple under-aged girls since at least 1966" and "he had sex with other under-aged female family members as well." Venie concluded his response by stating that L.A. and Wife "should not be able to obtain equitable relief in this court when they have behaved as child molesting frauds for fifty years . . . ."

{24}     Rule 16-106(A) NMRA provides that "[a] lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted" under Rule 16-106(B), but even then a lawyer may only disclose such confidences "to the extent the lawyer reasonably believes necessary." We conclude that there is sufficient support to prove that Venie violated Rule 16-106(A).

18

{25} Venie contends that he was justified in revealing his client's confidences under Rule 16-106(B)(2), (3) and (5). We disagree. Subsection (B)(2) provides that an attorney can reveal client confidences to the extent necessary "to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer's services." Subsection (B)(3) provides that a lawyer may reveal confidences "to prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services." In reviewing the context of the client's pleadings and Venie's perplexing response to them, it is evident that Venie disclosed the sensitive information for an improper purpose. Venie's response was not necessary to prevent L.A. from committing a crime or fraud that would result in injury to the financial interests or property of another.

{26} Furthermore, under Rule 16-106(B)(5), an attorney may reveal client confidences to the extent necessary "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client . . . ." Regarding fee disputes, the only disclosures an attorney is permitted to make are those necessary "to

prove the services rendered in an action to collect it." Rule 16-106, Comm. cmt. 13. In defending himself against L.A. and Wife's lawsuit, Venie should have responded only with demonstrating the amount of work he had performed to prove that he had earned the fees he charged them. Venie's disclosure of L.A.'s guilt was neither relevant nor material in "a garden-variety fee dispute," as he referred to the lawsuit between him and L.A.

{27} By revealing client confidences for his own benefit, Venie "violated the sanctity of the confidential relationship existing between attorney and client." *Dixon v. State Bar of Cal.*, 653 P.2d 321, 328 (Cal. 1982) (in bank). The confidences that clients share with their attorneys must be vigorously protected as the attorney-client relationship cultivates the trust imperative to the attorney's efficient representation of the client. *In re Lichtenberg*, 1994-NMSC-034, ¶ 10, 117 N.M. 325, 871 P.2d 981 (per curiam). Venie not only disregarded any precautions he could have taken in disclosing L.A.'s confidences, such as in camera review, he also revealed those confidences in a public court document, which then were printed in the *Albuquerque Journal* in an article titled "Lawyer says his ex-client is a child molester." Venie's disclosures threaten to undermine the profession if clients believe they cannot trust their attorneys to keep their confidences.

20

**B.      Case 737**

{28}    In Case 737, Venie raises a baseless defense to justify converting third-party funds to pay attorney's fees he alleged that his clients owed to him.  He asserts that he properly withheld third-party money as a retaining lien.

**1.      Claiming entitlement to third-party property in satisfaction of alleged client fees owed**

{29}    The parents of the second client (Parents) signed a retainer agreement with Venie and paid him a flat fee of $10,000 to represent R.C. on felony charges. R.C. did not sign this agreement.  The retainer agreement that Parents signed, titled "Earned on Receipt True Retainer Agreement for Pre Trial Services," provided that the flat fee of $10,000 was earned upon receipt, was "*not dependent upon hours of professional services rendered by VENIE, whether the Client's case* [*was*] *prosecuted, whether any appearances* [*were*] *made, or the outcome of Client's criminal case*," and pertained to services up to the setting of a trial date in the case or "*pre-trial*" legal services.[2]   (Emphasis in original.)   The retainer agreement also contained the following provision:

_____

[2]Although this opinion focuses on Venie's justifications for his misconduct rather than every rule violation, we emphasize that it is a violation of the Rules of Professional Conduct to consider a flat fee for future legal services earned upon receipt and to fail to place such a fee in trust until it is earned. *In re Yalkut*, 2008-NMSC-009, ¶ 26, 143 N.M. 387, 176 P.3d 1119 (per curiam).

> **REFUNDS**. . . . To the extent that Mr. Venie is relieved, the client or payors is [sic] entitled to a refund of any unearned fees. To the extent that Mr. Venie is relieved before completion of this matter FOR ANY REASON, all parties agree that Mr. Venie is entitled to *quantum meruit*, and that all parties stipulate that $450.00 an hour is Mr. Venie's hourly rate. All parties further stipulate and agree that Mr. Venie's hourly rate of $450.00 is reasonable. This means that the parties agree that if Mr. Venie is relieved for ANY REASON, he will be entitled to $450.00 per hour, plus costs as set forth below, for any and all work done, and any and all costs expended or incurred, in defense of the client.

There is no showing in the record that Venie explained the refunds provision to Parents or that Parents understood it.

{30} R.C.'s mother wired Venie $100,000 for payment of R.C.'s bond. Venie then deposited the check with the district court and posted R.C.'s bond. R.C.'s mother never authorized Venie to use the money for any purpose other than to post R.C.'s bond.

{31} During the course of Venie's representation of R.C., Venie hand-delivered a letter to R.C. in which he requested a total of $16,050 for 33.3 additional hours of pretrial services. In his letter, Venie identified work he anticipated performing and stated that "[t]his case has gone way beyond our initial contract and I need to be paid for the additional (and lengthy) work that has arisen since the start of the case." R.C., and not Parents, signed an agreement to the hourly charges and paid Venie $16,050.

{32} Ultimately R.C. terminated Venie's representation. R.C. then obtained new

22

counsel, who intended to file a motion to dismiss the charges against R.C. based on speedy trial grounds. R.C. requested receipts from Venie delineating the amount of money that he and Parents had paid to Venie for his legal services to prove financial loss for the prejudice prong of his speedy trial motion to dismiss. Venie responded to R.C.'s request by stating that R.C. and Parents had paid a total of $26,750, which included the $10,000 flat fee plus $700 in taxes paid by Parents and the $16,050 paid by R.C. for 33.3 additional hours of work plus taxes, but made no mention of any additional fees owed. In addition, Venie did not provide further substantive legal services after he was terminated.

{33} R.C.'s motion to dismiss was granted, and his charges were dismissed with prejudice. R.C.'s mother then called Venie's office to request return of the $100,000 she had wired to Venie to post R.C.'s bond. Venie obtained the check for the $100,000 in bond money from the district court, which was made out in his name because he had posted the bond. He then mailed Parents a check for $10,829.30 along with a 35-page invoice claiming additional fees owed to him of $89,170.70 based on his reading of the refunds provision from the retainer agreement that had been signed by Parents. Of the $89,170.70 in additional fees, over $10,000 were allegedly incurred after Venie's services were terminated. The invoice also included

charges for pretrial services that should have been covered by the original $10,000 flat fee. In a letter accompanying the invoice, Venie claimed that he was entitled to additional fees beyond the flat fee paid to him because he had been backing the efforts of R.C.'s new attorney all along.

{34}     Venie was not entitled to R.C.'s mother's bond money. Based on his reading of the refunds provision of the retainer agreement, Venie unilaterally decided to charge Parents on an hourly basis above the flat fee they had already paid, allegedly according to quantum meruit principles. *See Castillo v. Arrieta*, 2016-NMCA-040, ¶ 17, 368 P.3d 1249 (observing that attorney-client fee agreements are not enforceable unless they are fully known to and understood by the client). However, Venie was entitled to quantum meruit only if he had performed services for which he had yet to be paid at the time his representation was terminated, which was not the case here. *See Guest v. Allstate Ins. Co.*, 2010-NMSC-047, ¶ 49, 149 N.M. 74, 244 P.3d 342 (holding that an attorney who is discharged is only entitled to quantum meruit and cannot recover fees for services not rendered). Because R.C. fired Venie during the pretrial stage of his case, Venie did not provide services beyond those which were agreed upon under the retainer agreement.

{35}     Furthermore, Venie entered into only one contract with Parents that was not

24

signed by R.C., which was the true earned on receipt retainer agreement for pretrial services. Parents satisfied this agreement upon payment of the $10,000 flat fee. Venie argued that he had established an hourly-based agreement with both Parents and R.C. when he billed R.C. an additional $16,050 for 33.3 hours of work, and that it was not a unilateral decision to charge R.C.'s mother above the flat fee on an hourly basis. However, the second agreement had been signed only by R.C. and not by Parents; therefore, Venie had no right to charge R.C.'s mother more than the $10,000 flat fee.

{36} Venie's actions constituted conversion. Conversion has been defined as "the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *In re Yalkut*, 2008-NMSC-009, ¶ 25, 143 N.M. 387, 176 P.3d 1119 (per curiam) (internal quotation marks and citation omitted). Venie's actions precisely match the definition of conversion. He wrongfully exercised dominion and control of third-party funds by placing R.C.'s mother's bond money directly into his personal account instead of a trust account, contrary to Rule 16-115(A) and (E) NMRA, due to his failure to hold third-party funds separate from his own, particularly when there were multiple claims

25

to the same funds. He also wrongfully detained the funds after demand was made, contrary to Rule 16-115(D), when he refused to return all of R.C.'s mother's bond money.

{37} During his representation of the third client, Venie again alleged entitlement to third-party property to satisfy client fees greater than those that were actually owed to him. Venie entered into a fee agreement with A.C. and his mother to represent A.C. in a criminal matter. The agreement signed by A.C. and his mother included a refunds provision similar to the one in Parents' flat fee agreement in R.C.'s case. According to the agreement, A.C. and his mother paid a flat fee retainer for pretrial services that was capped at $7,500.

{38} A.C. ultimately filed a disciplinary complaint against Venie, and Venie filed a motion to withdraw as his counsel. Thereafter, Venie sent letters to A.C. and his mother demanding an additional payment of $3,571.60 more than the flat fee which had already been paid to him, and threatened to sue them if he did not receive payment within ten days of the date of the letter. Venie also sent them an invoice which included charges for services that were paid for by the flat fee. Finally, Venie filed a claim of lien for $4,406.83 against A.C.'s mother's home to fulfill the alleged accrued fees and "for future charges which may accrue and become delinquent."

{39} Venie alleges that he rightfully withheld R.C.'s mother's $89,170.70 and the $4,406.83 claim against A.C.'s mother's home as "retaining liens" and relies on *Prichard v. Fulmer*, 1916-NMSC-046, ¶ 8, 22 N.M. 134, 159 P. 39 for the proposition that an attorney has a right to "retain papers or other property that might come into his possession, or money that he in the course of his professional employment had collected, until all his costs and charges against his client were paid." In *Prichard*, the discussion on retaining liens is scant because most of the analysis pertained to charging liens, a different type of lien attorneys may use. *See id.* ¶¶ 9-14 (analyzing use of charging liens at common law). However, in *Prichard*, *id.* ¶ 8, this Court cited to *Weed Sewing Mach. Co. v. Boutelle*, which further described retaining liens and explained the proposition on which Venie relies. 56 Vt. 570, 577-78 (Vt. 1882). A retaining lien gives an attorney the right to retain papers, documents, and money "*against his client, assignments, or attachments*, until the general balance due him for legal services is paid." *Id.* at 578 (emphasis added); *accord McKnight v. Rice, Hoppner, Brown & Brunner*, 678 P.2d 1330, 1335 (Alaska 1984) ("An attorney's lien can only attach to property of the client."). Retaining liens can only be used against *client* property or property that was once owned by the client but then assigned to someone else or is now another's attachment property. Here,

Venie assessed liens against the property of third parties to which his clients never claimed ownership. In addition, Venie's actions do not meet the requirements of a charging lien, which only applies to funds recovered by the attorney's aid, such as a judgment or settlement, and not the private funds of a third party. *Id.* at 578.[3] Accordingly, Venie's contention that he was entitled to assert liens against third-party property to fulfill alleged client fees owed is completely erroneous.

**II.    CONCLUSION**

{40}    Venie's misconduct is indefensible and undoubtedly requires the most severe possible sanction.

{41}    THEREFORE, IT IS ORDERED that effective January 18, 2017, D. Chipman Venie is permanently disbarred from the practice of law in New Mexico pursuant to Rule 17-206(A)(1) NMRA;

{42}    IT IS FURTHER ORDERED that Venie shall comply with the requirements

---

[3]Venie also erroneously relies on *McPherson v. Cox*, 96 U.S. 404 (1877) to justify these liens. In *McPherson*, an attorney rightfully asserted a lien against a bond he held as trustee for the benefit of his client. *Id.* at 420-21. The bond was issued as security for payment of land the client sold to third parties, which the attorney had helped recover in an equity suit for which he was hired. *Id.* at 414-15. The client had agreed to pay the attorney's fees she owed from the funds recovered from the sale of the land. *Id.* at 414. Therefore, in *McPherson*, the attorney was legally in possession of client funds, which the client had specifically agreed to use to pay the attorney's fees.

28

of Rule 17-212 NMRA regarding disbarred attorneys;

{43}     IT IS FURTHER ORDERED that Venie shall reimburse and pay restitution to R.C.'s mother in the amount of $89,170.70, plus interest in the amount of fifteen percent (15%) per annum from July 3, 2015 until paid in full;

{44}     IT IS FURTHER ORDERED that Venie shall be enjoined from suing his former clients R.C., A.C., and A.C.'s mother for fees to which he is not entitled;

{45}     IT IS FURTHER ORDERED that Venie shall pay costs to the Disciplinary Board in the amount of $7,998.28 on or before February 18, 2017.  Any unpaid balance thereafter shall accrue interest at the statutory rate of eight and three-fourths percent (8 ¾%) per annum until paid in full, and any amount unpaid may be reduced to a transcript of judgment.

{46}     **IT IS SO ORDERED.**


_____
**EDWARD L. CHÁVEZ, Justice**


**WE CONCUR:**


_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**


_____
**BARBARA J. VIGIL, Justice**


_____
**JUDITH K. NAKAMURA, Justice**

30